**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

**STUART RUFFIN,**

**Plaintiff,**

**v.**

**VISTA INTERNATIONAL (ILLINOIS), INC., d/b/a THE DRAKE HOTEL, and HILTON HOTELS CORPORATION,**

**Defendants.**

**No. ____________________**

FILED: NOVEMBER 4, 2008
08 CV 6332
JUDGE LEFKOW
MAGISTRATE JUDGE KEYS
BR

**COMPLAINT**

Plaintiff Stuart Ruffin, through his attorneys, files this Complaint for violations of the Americans with Disabilities Act, including retaliation, along with supplemental claims under the Illinois Wage Payment and Collection Act and for intentional infliction of emotional distress, against Defendants Vista International (Illinois), Inc., d/b/a The Drake Hotel, and Hilton Hotels Corporation (collectively, "the Drake"), and states as follows:

**THE PARTIES**

1. Plaintiff Stuart Ruffin was employed by the Drake for 21 years, working his way up to the management level of the hotel's food and beverage operation. His final position with the hotel was Banquet Manager, which he held from June 1997 until June 2007.

2. Defendant Vista International (Illinois), Inc. is an Illinois corporation that does business as The Drake, a luxury hotel in downtown Chicago.

3. Defendant Hilton Hotels Corporation is a California corporation that owns and operates Vista International (Illinois), Inc.

**JURISDICTION AND VENUE**

4. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1367, and 42 U.S.C. § 12112.

5. The unlawful employment practices at issue in this suit were committed within the Northern District of Illinois. Venue is therefore proper under 28 U.S.C. § 1391(b)(2).

6. On February 4, 2008, Ruffin timely filed Charge No. 440-2008-02775 with the Equal Employment Opportunity Commission ("EEOC"). The EEOC issued a Notice of Right to Sue with respect to that charge on October 30, 2008; a copy of that notice is attached as **Exhibit A**. *See* 42 U.S.C. §§ 12117(a), 2000e-5(f)(1).

**BACKGROUND FACTS**

**Mr. Ruffin's Record of Service at the Drake.**

7. The Drake hired Ruffin as a captain in the hotel's casual Coq d'Or restaurant in 1986; he became the restaurant's manager less than a year later. In 1988, he was promoted to the position of assistant manager of the Drake's formal Oak Terrace restaurant, and in 1989 was promoted again to the role of Assistant Executive Steward, a job he held for two years. In 1991 he was promoted yet again to the role of Executive Steward. From there, Ruffin went on to become Director of Stewarding and Banquet Facilities in 1993, and Banquet Manager in 1997.

8. Ruffin's job performance was excellent, as evidenced not only by his meteoric rise through the hotel's ranks, but also by his enthusiastic performance reviews. For instance, an

early review discussing his role as manager of the Coq d'Or restaurant noted his "strong leadership skills" and his ability "to make decisions creatively to resolve problems," and stated that "he has worked to create the most formidable team in the Food and Beverage Operation." The review closed by stating that in the short time Ruffin had worked for the Drake, he had "made himself an asset not only to the Coq d'Or but the overall food and beverage management."

9. Another review, from 1992, stated that Ruffin "exceeded standards set forth in his Job Description," did an "excellent" job managing his department's payroll and operating expenses, and "possesses a high level of energy and skills which, if continued, will lead to further promotion." The review concluded: "Ruffin has developed into a key member of the Food & Beverage management team. His high level of leadership in his department has helped develop the Stewarding Department into a team."

10. The measure of Ruffin's exemplary performance at the Drake is also reflected in the warm guest comments and personal "thank-you" notes from management in his personnel file. For example, in 1989 the hotel's general manager thanked Ruffin for going above and beyond in handling a fire in the kitchen that involved toxic chemicals, noting, "While it was not your responsibility, nevertheless, you were there, and you assisted. . . . Thank you for caring." As another example, in 1996 a manager praised Ruffin for his extra effort in overhauling the hotel's basement storage area. In 2000 an event planner who had worked with Ruffin wrote the General Manager, noting that Ruffin "was professional and more than helpful in coordinating our timing of the meal," and that Ruffin and his colleagues "had a can do attitude & were very easy to work with." (Emphasis in original.) And in 2006 the general manager thanked Ruffin

for personally coordinating the visit to the Drake of President Bush; the manager noted the "outstanding" feedback he had received, and stated, "your hard work really shows."

11. On top of his excellent performance, Ruffin showed his dedication to the Drake by working long hours and rarely taking vacations, offering instead to stay behind so that his colleagues could take vacations of their own.

**Ruffin's Health Problems Begin.**

12. Ruffin enjoyed good health until the fall of 2005, when he was diagnosed with Achilles tendinitis. His physician put Ruffin into a cast and prescribed steroid therapy.

13. Ruffin's foot problems persisted, however, and he was forced to undergo surgery on his right foot in late March 2006. The surgery did not entirely succeed—Ruffin had to undergo further surgery after the events at issue in this lawsuit—and the recovery was characterized, in his physician's words, by "excessive swelling & lack of motion," and significant physical pain.

14. For weeks following the March 2006 surgery, Ruffin was unable to walk except in a limited fashion. Consequently, he was unable to work for most of the month of April 2006, using some of his substantial accumulated vacation time to cover the leave.

15. Only a few months later, in June 2006, Ruffin suffered two detached retinas—one in each eye. This condition left him unable to see and required emergency surgery and further medical leave. He returned to work as soon as he could, even though the effort put a strain on his vision.

16. After Ruffin returned to work, his misfortunes continued, due in large part to the Drake's negligence. In August 2006 he slipped on a puddle of water that had been left in the Drake's cafeteria, spraining his ankle and re-injuring his right foot. Shortly thereafter, his right retina detached again, leading to a second eye surgery in October 2006. His physician did not clear him to return to work until mid-December 2006. Ruffin continues to see a retinologist, and still experiences problems that are expected to affect his vision permanently.

**As Soon as Ruffin's Health Deteriorated, The Drake Began Making False Accusations and Imposing Impossible Demands.**

17. Almost immediately after Ruffin began experiencing health problems, the Drake started aggressively and unfairly attacking his job performance. His superiors also began to set unrealistic expectations in the hope that he would either fail or quit.

18. For instance, in May 2006, Ruffin's manager, Stefan Outrequin, provided Ruffin with a set of performance objectives and told him to complete them within 90 days. The objectives included developing a new training plan for the entire year, writing a standard operating procedures manual from scratch, planning the hotel's Thanksgiving banquet operations (which were half a year away), and holding weekly, bi-weekly, and monthly meetings with the many employees whom Ruffin supervised.

19. As soon as the 90 days were over, the Drake harshly criticized Ruffin in writing for failing to complete all of these impossible objectives.

20. Notably, the Drake handed Ruffin these objectives just a few weeks after he returned to work from his foot surgery, when he had serious difficulty walking because of the

pain. Through the latter part of his shift, Ruffin's foot would regularly swell to the point that he had difficulty keeping his shoe laced.

21. At that time Ruffin was able to complete his essential job functions but not the additional, discretionary tasks that had been imposed on him while he was recovering from his foot surgery.

22. The Drake rigorously enforced its arbitrary 90-day deadline even though within that 90-day period Ruffin (1) was recovering from an invasive foot surgery; (2) lost his sight and had to undergo emergency surgery on both eyes, and (3) slipped and fell as a result of the Drake's negligence, re-injuring his foot and his eye.

23. The Drake continued to criticize Ruffin throughout the fall of 2006 and spring of 2007, notwithstanding his need for a second eye surgery and medical leave in October.

24. In late 2006 and early 2007, the Drake demanded, in violation of Ruffin's doctor's orders, that Ruffin perform much more computer work than he had ever been asked to do before.

25. This additional computer work was not an essential part of Ruffin's job.

26. In a November 2006 note, which Ruffin presented to his superiors, Ruffin's physician stated that because of his eye surgery, Ruffin's "vision will be decreased for several months and he will have difficulty with fine visual tasks." Ruffin advised his superiors that he was physically unable to read his computer screen for long periods of time, but they failed to provide any accommodation, and instead insisted that he do additional, non-essential computer work.

27. Particularly troubling to Ruffin was the false assertion, repeated in several 2007 performance memos, that Outrequin and others had repeatedly offered to help but that Ruffin had refused any assistance. In fact, Outrequin maintained a culture in which any employee who asked for assistance was seen as failing to perform his share of the work. Outrequin's written statements, like many of his false and unfair criticisms of Ruffin's performance, were merely intended to make a paper trail to get rid of Ruffin.

**Outrequin Fires Ruffin Expressly Because of Ruffin's Health Condition.**

28. Throughout the spring of 2007, Ruffin made every effort to comply with the Drake's unreasonable and unfair demands, frequently spending eighteen-hour days on the job.

29. In May 2007, Outrequin approached Ruffin, telling him that he had "greatly improved" on the issues discussed in his various performance reviews.

30. Nevertheless, Outrequin expressly alluded to Ruffin's "physical condition," and confided in Ruffin that senior management had said that they were "worried about potential lawsuits" that Ruffin might bring.

31. Ruffin replied that he could perform his job, even without any accommodation, but Outrequin asked him to resign.

32. In light of the open hostility of management at the Drake, Ruffin took some of his vacation time to consider his options.

33. The Drake's policy had always been to include a banquet department employee's gratuity (or "trunk") pay as part of pay for vacation time.

34. Trunk pay amounted to as much as 75% of Ruffin's overall compensation.

35. Outrequin told Ruffin that if he refused to resign, the Drake would withhold his trunk pay during his vacation time; in other words, it would pay him only his salary, and not his share of the banquet department's gratuities that employees routinely received in their vacation pay.

36. Ruffin refused to resign and hired counsel.

37. On June 27, 2007, through counsel, Ruffin contacted the Drake's assistant director of human resources, charging that the Drake's attempt to force Ruffin to resign and the threat to withhold trunk pay if he did not, as well as the treatment he had received over his foot and eye injuries, were discrimination under the Americans with Disabilities Act as well as other laws, both statutory and common law.

38. Ruffin was fired the very next day, on June 28, 2007.

**Count One**
**AMERICANS WITH DISABILITIES ACT—DISCRIMINATION**

39. Ruffin incorporates paragraphs 1 through 38 as if fully restated herein.

40. The Americans with Disabilities Act (ADA) provides that "No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees." 42 U.S.C. § 12112(a).

41. The ADA defines "disability" to include "being regarded as" having "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." *Id.* § 12102(2).

42. The Drake is a "covered entity" and Ruffin is an "employee" under the ADA. *Id.* § 12111(2), (4).

43. Ruffin was able to perform the essential functions of his job as Banquet Manager. Nevertheless, the Drake regarded him as disabled and fired him because of his perceived disability, in violation of the ADA.

**Count Two**
**AMERICANS WITH DISABILITIES ACT—RETALIATION**

44. Ruffin incorporates paragraphs 1 through 43 as if fully restated herein.

45. The ADA provides: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter." *Id.* § 12203(a).

46. When Ruffin, through his counsel, contacted the Drake's assistant director of human resources on June 27, 2007, and asserted his belief that he was being discriminated against based on the Drake's perception that he was disabled, Ruffin was engaging in protected activity. The Drake fired Ruffin in part because of that protected activity, in violation of the ADA.

**Count Three**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

47. Ruffin incorporates paragraphs 1 through 46 as if fully restated herein.

48. The Drake falsely and unfairly criticized Ruffin for months and made unreasonable and unfair demands of him, working him to the point of exhaustion while he endured medical crisis after crisis, some of which had been caused been the Drake's negligence. The Drake routinely held him to a higher standard than employees it did not view as disabled; gave him an impossible number of tasks that it knew no one could accomplish; failed to provide him with essential information in a timely manner regarding the banquets for which he was responsible, frustrating his ability to succeed; and berated him unfairly.

49. The Drake's barrage of unfair complaints about Ruffin's job performance, and its decision to pounce aggressively upon his rare mistake while failing to praise his many achievements, made him feel like he was under a magnifying glass and was being set up for failure at a time when his physical condition created its own challenges. The Drake did this in order to make Ruffin fail or quit, because it didn't want a disabled employee serving as Banquet Manager.

50. The Drake's behavior—figuratively kicking a disabled employee when he was down—was truly extreme and outrageous, and the Drake knew that its behavior would cause Ruffin severe emotional distress.

51. The Drake's cruel and unconscionable conduct did in fact cause Ruffin such distress. In the months leading up to and following his dismissal, he was unable to sleep, and all but lost his appetite, losing 35–40 pounds from stress caused by the Drake's tortious conduct. Shortly before his termination, a Drake employee expressed "shock" at Ruffin's haggard and emaciated appearance, which had been caused by the Drake's cruel treatment of him.

52. The Drake's conduct also severely taxed Ruffin's family life, causing him to grow volatile and irritable, and negatively affecting his relationship with his wife and children.

53. The Drake thereby intentionally inflicted emotional distress on Ruffin in violation of the common law of Illinois.

**Count Four**
**ILLINOIS WAGE PAYMENT AND COLLECTION ACT**

54. Ruffin incorporates paragraphs 1 through 53 as if fully restated herein.

55. The Illinois Wage Payment and Collection Act provides:

> Every employer shall pay the final compensation of separated employees in full, at the time of separation, if possible, but in no case later than the next regularly scheduled payday for such employee.

820 ILCS § 115/5.

56. The Act defines "final compensation" as:

> wages, salaries, earned commissions, earned bonuses, and the monetary equivalent of *earned vacation* and earned holidays, and

> any other compensation owed the employee by the employer pursuant to an employment contract or agreement between the 2 parties.

*Id.* § 115/2 (emphasis added); *see also* § 115/5 ("the monetary equivalent of all earned vacation shall be paid" to departing employees).

57. Ruffin was an "employee" and the Drake was his "employer" for purposes of the Act. *See id* § 115/2.

58. The established practice of the Drake is to pay banquet department employees' vacation time "on the trunk"—meaning to pay the employee his salary plus his share of the department's gratuities.

59. The Drake violated this practice by withholding from Ruffin's vacation pay his "trunk" pay, in violation of the Act. The Drake, including Outrequin, knowingly withheld this pay in order to pressure Ruffin to resign, in violation of the Act. *See also id.* § 115/13.

60. On September 9, 2008, more than three days before filing this Complaint, Ruffin sent the Drake a demand letter in compliance with the Attorney's Fees in Wage Actions Act, 705 ILCS § 225/1, demanding his earned vacation pay. (*See* **Exhibit B**, attached hereto.) The Drake did not respond to the demand, thereby indicating its refusal to pay.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief:

(a) Finding the Defendants in wilful violation of the Americans With Disabilities Act and the Wage Payment and Collection Act;

(b) Finding that the Defendants committed the tort of intentional infliction of emotional distress;

(b) Awarding Plaintiff his earned vacation pay and additional damages, including punitive damages;

(d) Awarding Plaintiff pre-judgment interest and reasonable attorneys' fees and costs, including under the Attorney's Fees in Wage Actions Act, 705 ILCS § 225/1, and under the ADA, 42 U.S.C. § 12205; and

(e) Awarding Plaintiff all additional relief the Court deems just and equitable.

**JURY TRIAL DEMAND**

Ruffin demands a jury trial.

Respectfully submitted,

**STUART RUFFIN**

Dated: November 4, 2008.

By: s/ Fay Clayton
One of His Attorneys

Fay Clayton
Michael J. O'Donnell
ROBINSON CURLEY & CLAYTON, P.C.
300 South Wacker Drive, Suite 1700
Chicago, Illinois 60606
(312) 663-3100 – Telephone
(312) 663-0303 – Facsimile